[Crim. No. 4382. In Bank. Apr. 2, 1942.]

THE PEOPLE, Respondent, v. JOHN GONZALES et al., Appellants.

Leo R. Friedman for Appellants.

Earl Warren, Attorney General, J. Albert Hutchinson and David K. Lener, Deputies Attorney General, Matthew Brady, District Attorney, and Joseph A. Garry, Assistant District Attorney, for Respondent.

TRAYNOR, J.—On June 17, 1940, an indictment was filed charging defendants Gonzales and Chierotti with having conspired together on May 25, 1940, to commit grand theft by fraudulent representations to Secundo Valenzano regarding a machine that purportedly could reproduce United States currency with the use of certain chemicals. The evidence showed that defendant Gonzales, after striking up an acquaintance with Secundo Valenzano, told Valenzano that a rich man had the machine, that real currency was necessary in making the reproductions, and that he would surreptitiously get possession of the machine and bring it to Valenzano's saloon. He brought the machine there, put some real bills into it, used the chemicals, and when the machine was opened, there were two bills for each one originally inserted. Thereupon Gonzales told Valenzano that if he could get several thousand dollars in new bills, equal to an amount to be furnished by Gonzales, each could double his money by using the machine. Valenzano put up no money but notified the police who arrested both Gonzales and Chierotti.

Valenzano was the only witness who testified to the fore-

going events. Police Officer Iredale testified that on June 6, 1940, he and Police Officer Linss, without any warrant, authority, or permission, entered the apartment of defendant Chierotti in the latter's absence and took therefrom a black case containing not only bottles of liquid but a machine, subsequently identified by Valenzano as that used by Gonzales. Chierotti and Gonzales objected to any testimony by Officer Iredale regarding the entry and search of Chierotti's apartment and the seizure of the case and contents, as well as to the introduction and use of the latter as evidence, on the ground that the entry, search, seizure, and use of the property violated the rights guaranteed to Chierotti by the Fourteenth Amendment to the Constitution of the United States, and the search and seizure and due process clauses of the Constitution of California. (Cal. Const., art. I, secs. 19, 13.)

Before the commencement of the trial Chierotti sought an injunction in an independent proceeding against the San Francisco Police Department and Officer Iredale to enjoin the use of the case and contents at the trial and to restrain Officer Iredale from testifying to anything he saw, did or heard while engaged in his search and seizure. The court denied the injunction and Chierotti appealed to this court. Pending determination of the appeal, the lower court granted a temporary injunction restraining Officer Iredale from testifying with regard to the entry into Chierotti's apartment. Many months before the trial Chierotti filed a written motion for an order directing the return to him of the case and contents, and the exclusion from evidence, not only of this property, but of any testimony of the officers regarding the search and seizure or based on information acquired as a result thereof. The motion was denied. At the trial the court refused to enforce the temporary injunction, allowing Officer Iredale to testify in direct defiance thereof. The defendants were found guilty by the jury. After judgment was pronounced each defendant appealed to this court from the order denying his motion for a new trial and from the judgment.

■ The Fourth Amendment to the Constitution of the United States prohibits unreasonable searches and seizures by federal officers. Pursuant to this mandate the federal courts forbid the introduction in court of evidence obtained by an illegal search or seizure if a timely motion for its exclusion is made by the accused. (*Byars* v. *United States,* 273· U. S. 28 [47 S. Ct. 248, 71 L. Ed. 520]; *Go-Bart Im-*

*porting Co.* v. *United States,* 283 U. S. 344 [51 S. Ct. 153, 75 L. Ed. 374] ; *Gouled* v. *United States,* 252 U. S. 298, 302 [41 S. Ct. 261, 65 L. Ed. 647] ; *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385 [40 S. Ct. 182, 64 L. Ed. 319] ; *Boyd* v. *United States,* 116 U. S. 616 [6 S. Ct. 524, 29 L. Ed. 746] ; *Weeks* v. *United States,* 232 U. S. 383 [34 S. Ct. 341, 58 L. Ed. 652] ; *Nardone* v. *United States,* 308 U. S. 338 [60 S. Ct. 266, 84 L. Ed. 307] ; *Ex parte Jackson,* 96 U. S. 727, 733 [24 L. Ed. 877] ; *Amos* v. *United States,* 252 U. S. 313 [41 S. Ct. 266, 65 L. Ed. 654] ; *Agnello* v. *United States,* 269 U. S. 20 [46 S. Ct. 4, 70 L. Ed. 145].) The California Constitution contains an identical provision (Cal. Const., art. I, sec. 19), but the accepted rule in this state, as in many others, permits the introduction of improperly obtained evidence on the ground that the illegality of the search and seizure does not affect the admissibility of the evidence. (*People* v. *Mayen,* 188 Cal. 237 [205 Pac. 435, 24 A. L. R. 1383] ; *In re Polizzotto,* 188 Cal. 410 [205 Pac. 676] ; *People* v. *Le Doux,* 155 Cal. 535 [102 Pac. 517] ; *Herrscher* v. *State Bar,* 4 Cal. (2d) 399 [49 P. (2d) 832]. See cases cited in 88 A. L. R. 348.) The defendant may have civil and criminal remedies against the officers for their illegal acts (see Pen. Code, sec. 146; *Silva* v. *MacAuley,* 135 Cal. App. 249 [26 P. (2d) 887, 27 P. (2d) 791] ; *Ryan* v. *Crist,* 23 Cal. App. 744 [139 Pac. 436] ; 15 So. Cal. L. Rev. 139, 141 et seq.), but the state is not precluded from using the evidence obtained thereby.

The Fourth Amendment to the Constitution of the United States is not a limitation upon the states (*National Safety Deposit Co.* v. *Stead,* 232 U. S. 58 [34 S. Ct. 209, 58 L. Ed. 504] ; *Ohio* v. *Dollison,* 194 U. S. 445 [24 S. Ct. 703, 48 L. Ed. 1062]), and California is free to interpret its own Constitution. Defendants contend, however, that the prohibition in the Fourth Amendment of unreasonable searches and seizures is included in the provision of the Fourteenth Amendment that no state shall deprive any person of life, liberty, or property without due process of law, and therefore that under the interpretation given to the Fourth Amendment by the federal courts the introduction of evidence obtained by an illegal search and seizure constitutes a denial of due process of law. Not all of the first ten amendments to the federal Constitution, however, fall within the concept of due process of law. (*Palko* v. *Connecticut,* 302 U. S. 319 [58 S. Ct. 149,

82 L. Ed. 288]; *Twining* v. *New Jersey*, 211 U. S. 78 [29 S.
Ct. 14, 53 L. Ed. 97]; *Snyder* v. *Massachusetts*, 291 U. S. 97
[54 S. Ct. 330, 78 L. Ed. 674, 90 A. L. R. 575]. See 39 Harv.
L. Rev. 431; 24 Harv. L. Rev. 366.) In the determination of
whether the prohibition against unreasonable searches and
seizures is included within this concept, the unlawful search
and seizure must be distinguished from the introduction in
court of the evidence obtained as a result thereof. ''The right
of the people to be secure in their persons, houses, papers, and
effects against unreasonable searches and seizures'' may be
so fundamental as to make any unreasonable search and seiz-
ure by a public officer a violation of due process of law. It
does not necessarily follow, however, that the use in a court
of law of evidence thus obtained is so contrary to fundamental
principles of liberty and justice as to constitute a denial of
due process of law. ■  A criminal trial does not consti-
tute a denial of due process of law so long as it is fair and
impartial. (See cases cited in 16 C. J. S., p. 1185 et seq.) There
is a failure to observe ''that fundamental fairness essential
to the very concept of justice'' when a trial is but a pretense
(*Lisenba* v. *California*, 314 U. S. 219, 236 [62 S. Ct. 280,
290, 86 L. Ed. ——]), as a trial dominated by a mob (*Moore*
v. *Dempsey*, 261 U. S. 86 [43 S. Ct. 265, 67 L. Ed. 543]), or
when the defendant is denied the right to counsel (*Johnson*
v. *Zerbst*, 304 U. S. 458 [58 S. Ct. 1019, 82 L. Ed. 1461]),
or when his conviction results from testimony known by the
prosecution to be perjured (*Mooney* v. *Holohan*, 294 U. S.
103 [55 S. Ct. 340, 79 L. Ed. 791, 98 A. L. R. 406]) or from
an involuntary confession obtained through coercion or tor-
ture. (*Chambers* v. *Florida*, 309 U. S. 227 [60 S. Ct. 472, 84
L. Ed. 716]; *Brown* v. *Mississippi*, 297 U. S. 278 [56 S. Ct.
461, 80 L. Ed. 682].) ■  While the United States Supreme
Court has held that the due process clause includes the guar-
antee of the Fifth Amendment against compulsory self-in-
crimination to the extent that the Amendment forbids the use
of a confession obtained by coercion or torture (*Chambers* v.
*Florida, supra; Brown* v. *Mississippi, supra; Lisenba* v. *Cali-
fornia, supra.* See *Bram* v. *United States*, 168 U. S. 532 [18
S. Ct. 183, 42 L. Ed. 568]), it has done so because a confes-
sion obtained by coercion or torture is so unreliable that its
use violates all concepts of fairness and justice. (*Chambers*
v. *Florida, supra; Brown* v. *Mississippi, supra; Lisenba* v.
*California, supra*; cf. *Twining* v. *New Jersey, supra*.) The use

of evidence obtained through an illegal search and seizure, however, does not violate due process of law for it does not affect the fairness or impartiality of the trial. (*People* v. *Defore*, 242 N. Y. 13 [150 N. E. 585] ; *People* v. *Mayen, supra; Com.* v. *Donnelly*, 246 Mass. 507 [141 N. E. 500] ; *Johnson* v. *State*, 152 Ga. 271 [109 S. E. 662, 19 A. L. R. 641].) The fact that an officer acted improperly in obtaining evidence presented at the trial in no way precludes the court from rendering a fair and impartial judgment. It has long been an established rule of evidence that "the admissibility of evidence is not affected by the illegality of the means through which the party has been enabled to obtain the evidence." (8 Wigmore, Evidence, (3rd. ed.) sec. 2183, p. 5, and cases there cited.)

Defendants contend that the trial court should not have permitted Officer Iredale to testify in view of the temporary injunction restraining him from testifying with regard to the entry into Chierotti's apartment. Objections to the testimony of a witness, however, should be made to the court before which he testifies and have no place in an injunction proceeding in another court. Any competent person who is properly subpoened, and who is not privileged, must appear in court and answer questions pertinent to the matter in issue. If he refuses to testify he may be punished for contempt of court, and no one may lawfully prevent or dissuade him from testifying. (Code Civ. Proc. secs. 128, 177, 1955, 1986, 1990, 1991, 1992, 1993; Pen. Code secs. 136, 166, 1331. See cases cited in 8 Wigmore, Evidence (3rd ed.) secs. 2190-2195; 27 Cal. Jur., p. 9 et seq.) Clearly it is the objective of these provisions to prevent interference with the testimony of witnesses and the issuance of the temporary injunction was therefore improper. Even if it were error for the trial court to permit Officer Iredale to testify despite the temporary injunction it was in no way prejudicial to defendants, for such testimony could not be excluded on a new trial in view of the holding herein that the testimony was admissible and the affirmance of the order denying an injunction in *Chierotti* v. *San Francisco Police Department*, S. F. 16646, this day decided, *post* p. 895 [124 P. (2d) 51].

On cross-examination defendants' attorney asked Officer Iredale if he had not been enjoined from testifying concerning anything he had learned as a result of his illegal search of Chierotti's apartment. Defendants contend that they had a right to ask this question for the purpose of im-

peaching the credibility of the witness by showing interest, bias, or prejudice and that the trial court therefore erred in sustaining an objection to it. It does not follow, however, that a witness would be inclined to testify falsely because he testified in the face of an injunction. On the contrary, in the words of the trial court, "the jury would be more inclined to believe the police officer who testified, if he testified despite the injunction and order. They would believe he was doing his duty." The question was immaterial and the objection to it was properly sustained.

Defendants have also objected to the refusal of the trial court to give certain instructions to the jury. Proposed instruction number 30 stated: ". . . It is the law of this state, that in determining whether any such conspiracy existed of which the defendant Chierotti was a party, that testimony of the acts or declarations of the defendant Gonzales cannot be considered by you, and it is your duty to disregard all evidence as to any acts or declarations of the defendant Gonzales, and to determine the existence or non-existence of such conspiracy, so far as defendant Chierotti is concerned, from such other evidence as may be in the case against him. The fact that an unlawful conspiracy existed of which the defendant Chierotti was a member and the unlawful purpose of such conspiracy, must be established by evidence, to a moral certainty and beyond a reasonable doubt, separate and apart from and independent of any testimony as to any declarations that were made by the defendant Gonzales. In other words, in determining whether defendant Chierotti was a member of the conspiracy charged you cannot consider any declaration or act that the defendant Gonzales said or did." Proposed instruction number 31 is the same as number 30 except that it applies to defendant Gonzales instead of defendant Chierotti. Proposed instruction number 32 stated: "You are instructed that a conspiracy cannot be proven merely by the acts or declarations of an alleged conspirator and that you may not consider such acts or declarations unless you are first convinced beyond a reasonable doubt by entirely independent evidence that a conspiracy existed."

The trial court instructed the jury on the subject of these instructions as follows: "The first fundamental question that you should determine in this case is: Was there in fact a conspiracy formed as charged in the indictment? If you answer that question in the negative, you are at an end of the case and your verdict should be not guilty. If, on the

other hand, you answer that question in the affirmative, you should then determine the question whether these defendants actively participated and entered into such conspiracy or scheme. In deciding the issues in this case you should take into consideration all the evidence admitted in the case, both for the State and for the defendants. . . . In considering the guilt or innocence of the defendant Chierotti you must consider only the evidence that has been admitted against him and cannot consider any evidence that has been admitted only as evidence against the defendant Gonzales. In considering the guilt or innocence of the defendant Gonzales you must consider only the evidence that has been admitted against him and cannot consider any evidence that has been admitted only as against the defendant Chierotti. You cannot return a verdict finding one of the defendants guilty solely on the ground that you find the evidence sufficient to establish the guilt of the other defendant.''

These instructions told the jury that evidence admitted against Chierotti could not be used against Gonzales and that evidence admitted against Gonzales could not be used against Chierotti. They are ambiguous in failing to indicate to the jury what evidence was admitted against Gonzales and what evidence was admitted against Chierotti. The record, however, reveals that at the time evidence as to the acts and declarations of Gonzales was introduced, the court stated in the presence of the jury that the evidence was admitted against Gonzales and not against Chierotti, and that at the time evidence as to the acts and declarations of Chierotti was introduced the court stated that it was admitted against Chierotti and not against Gonzales. The instructions, therefore, read in conjunction with the statements of the court during the trial indicated to the jury that the acts and declarations of Gonzales could not be used to prove Chierotti a party to the conspiracy and that the acts and declarations of Chierotti could not be used to prove Gonzales a party thereto. Any error in the instructions because of their ambiguity was therefore not prejudicial to defendants.

Defendants contend the evidence is insufficient to establish that Chierotti participated in the conspiracy. Participation in a conspiracy, however, can be shown by circumstantial evidence. (See cases cited in 5 Cal. Jur. 521.) The evidence shows that a bag containing the money making machine and bottles of liquid was in Chierotti's apartment, that

Chierotti had possession of the key to the lock on the bag, that Chierotti knew Gonzales, that Gonzales had been to Chierotti's apartment and was there on the Monday before the arrests were made, that Chierotti was seen leaving his apartment house with Gonzales carrying a bag, that Gonzales met with Chierotti shortly after leaving Valenzano's tavern, that Gonzales exhibited to Valenzano a large roll of bills but when Gonzales and Chierotti were arrested together shortly thereafter Chierotti had possession of a large roll of bills but Gonzales did not. This evidence is sufficient to justify the jury's conclusion that Chierotti participated with Gonzales in a conspiracy to steal money from Valenzano by use of the pretended money making machine.

■ Any misconduct that may have existed on the prosecutor's part in referring to other bunco cases and bunco games during the course of his argument to the jury is not sufficiently prejudicial to justify reversal, particularly since the trial court refused to grant a new trial on this ground. (See *Imlay* v. *California Cab Co.,* 124 Cal. App. 68 [11 P. (2d) 1116]; *Alberts* v. *Lytle,* 1 Cal. App. (2d) 682 [37 P. (2d) 705].)

The judgment of conviction and orders denying a new trial are affirmed.

Gibson, C. J., Shenk, J., Curtis, J., and Edmonds, J., concurred.

CARTER, J., Dissenting:—I dissent.

The rule followed by the majority opinion seriously impairs the efficacy and sanctity of the constitutional guarantee against unlawful searches and seizures. (Cal. Const., art. I, sec. 19.) The particular issue is the competency of evidence in a criminal proceeding which has been obtained from defendant in violation of that constitutional prohibition. Although it is my opinion that the same constitutional guarantee appearing in the Fourth Amendment to the Constitution of the United States is applicable to states as well as federal agencies because it is one of the fundamental liberties embraced in the Fourteenth Amendment to the Constitution of the United States, I will limit my discussion to the proposition that even if the right to be secure against unlawful searches and seizures is not protected by the federal Constitution with reference to state agencies, the provision in our

state Constitution compels the rule that evidence obtained in contravention thereof shall not be competent or admissible.

It cannot be seriously questioned that to permit the use of evidence obtained in violation of the constitutional provision at least to some extent infringes upon the field of liberty secured by the inhibition against unlawful searches and seizures. But it goes beyond a mere partial invasion. It in effect practically destroys the right. That is true for the reason that the value of any right varies in direct proportion to the means afforded for the protection of the right; the realization of any benefit from the right is wholly dependent upon the existence of instruments for that purpose. If it may be violated and the fruits of the violation directed against the possessor of it, the fruits of it are lost, and it is no more than a bare abstraction.

I take it that a person in preserving the right here involved is justified in committing homicide. However, if he does not adopt that extreme measure, and in a well ordered social system that should be discouraged, he is faced with possibility that evidence obtained may be used against him. Certainly he should be given credit and security rather than being penalized for failing to pursue such an extreme course.

Permitting such evidence to be used is an invitation and encouragement to law enforcing officials to violate the Constitution. It gives them free reign to act upon mere suspicion and conjecture, to the harassment of the persons offended and to the end that the sanctity of his home or depository of his papers and effects is destroyed. It is of small comfort to say that he has an action against the officers. In most instances the amount of recovery would be negligible and the process costly.

In *Weeks* v. *United States*, 232 U. S. 383 [34 S. Ct. 341, 58 L. Ed. 652], it was stated with respect to this issue:

"Judge Cooley, in his Constitutional Limitations, pp. 425, 426, in treating of this feature of our Constitution said: 'The maxim that "every man's house is his castle" is made a part of our constitutional law in the clauses prohibiting unreasonable searches and seizures, and has always been looked upon as of high value to the citizen.' 'Accordingly,' says Lieber in his work on Civil Liberty and Self-Government, 62, in speaking of the English law in this respect, 'no man's house can be forcibly opened, or he or his goods be carried away after it has thus been forced, except in cases of felony; and

then the sheriff must be furnished with a warrant, and take great care lest he commit a trespass. This principle is jealously insisted upon.' In *Ex parte Jackson*, 96 U. S. 727, 733, [24 L. Ed. 877, 879], this court recognized the principle of protection as applicable to letters and sealed packages in the mail, and held that, consistently with this guarantee of the right of the people to be secure in their papers against unreasonable searches and seizures, such matter could only be opened and examined upon warrants issued on oath or affirmation, particularly describing the thing to be seized, 'as is required when papers are subjected to search in one's own household.'

"In the Boyd case, *supra*, after citing Lord Camden's judgment in *Entick* v. *Carrington*, 19 How. St. Tr. 1029, Mr. Justice Bradley said (630):

" 'The principles laid down in this opinion affect the very essence of constitutional liberty and security. They reach farther than the concrete form of the case then before the court, with its adventitious circumstances; they apply to all invasions on the part of the government and its employees of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors and the rummaging of his drawers that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty, and private property, where that right has never been forfeited by his conviction of some public offense,—it is the invasion of this sacred right which underlies and constitutes the essence of Lord Camden's judgment.' " And again:

"The efforts of the courts and their officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land."

In addition to the federal courts, the following states have adopted the rule that evidence obtained in violation of the Constitution is not admissible. (Florida, Idaho, Illinois, Indiana, Kentucky, Michigan, Mississippi, Missouri, Montana, Oklahoma, Oregon, South Dakota, Tennessee, Texas, Washington, West Virginia, Wisconsin, Wyoming.) (See 24 A. L. R. 1408; 32 id. 408; 41 id. 1145; 52 id. 477; 88 id. 348; 134 id. 819.)

Obviously, the purpose and object of the constitutional provision in question was to guarantee security to the individual

against invasion of his premises by officers seeking evidence which might be used by them in a criminal prosecution without making oath or affirmation particularly describing the place to be searched or the person or thing to be seized. In other words, it was contemplated by the framers of the Constitution that before an officer should be permitted to secure evidence by means of a search and seizure, the facts supporting the claim of right to make the search should be submitted to a magistrate in the form of an affidavit, and if the magistrate determined such facts to be sufficient he would issue a warrant authorizing the search of premises particularly described in the warrant and the seizure of the person or thing particularly described therein. To say that to permit the use of evidence acquired in violation of this constitutional provision does not abrogate or destroy the constitutional right so guaranteed is to my mind counterfeit logic.

History reveals many abuses by public officers both in England and colonial times in this country when officers invaded the premises of persons suspected of crimes, many of which have long since been abolished, and the papers and effects of innocent victims seized and used for the persecution as well as prosecution of such victims. It was to prevent these abuses that the Fourth Amendment was added to the Constitution of the United States and section 19 of article I was incorporated in the Constitution of California. In my opinion there is no such urgency or necessity enjoined upon prosecuting officers today to obtain evidence of law violation which requires them to violate a constitutional provision so specific in its prohibitions, and which has enshrined within its provisions such sacred concepts of liberty, security and justice as the constitutional provision here in question.

The more I read and hear about the tyranny of totalitarianism as it pervades a large part of the world today, the more appreciative I am of the constitutional form of government and the constitutional guarantees which we have in this country and in this state. And every time I see an effort being made to abrogate or nullify by interpretation any of the constitutional provisions designed to protect the life, liberty and property of the people, I shudder to contemplate what will happen if this disposition to abrogate and nullify these constitutional provisions continues. I, for one, shall never yield to the doctrine that a constitutional provision designed to protect the life, liberty and property of the people of this

country should be abrogated or nullified by interpretation. If political, social or economic conditions require changes in our Constitution, such changes should be made by amending the Constitution in the manner prescribed by it, but it is not for the courts by their decisions to abrogate or nullify constitutional provisions by interpretation or read into those provisions that which was never intended to be included therein.

In my opinion it was prejudicial error requiring a reversal of the judgment for the trial court to admit the evidence obtained by the police officers as the result of the unlawful entry and search of the premises occupied by the defendants, and the judgment of conviction against them should therefore be reversed.

Houser, J., concurred.

Appellants' petition for a rehearing was denied April 30, 1942.  Carter, J., voted for a rehearing.